# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JASMIN RZAYEVA, ESTATE OF :
MARGO MUSAYELOVA, and :
SVETLANA BAGDASARYAN, :
      Plaintiffs, :    Case No. 3:06-cv-882 (PCD)
     :
      v. :
     :
UNITED STATES OF AMERICA, et al., :
      Defendants. :

## RULING ON MOTIONS TO DISMISS

Pro se plaintiff Jasmin Rzayeva, individually and as representative of the Estate of Margo

Musayelova and as representative of Svetlana Bagdasaryan ("Plaintiffs"), filed a 733-paragraph

Complaint dated May 30, 2006 against 22 defendants: the United States; the U.S. Department of

Justice ("DOJ"); the Federal Bureau of Investigation ("FBI"); the U.S. Department of Health and

Human Services ("DHHS"); Shawn J. Chen, Assistant U.S. Attorney, District of Connecticut; the

State of Connecticut; Jodi Rell, Governor of the State of Connecticut; Richard Blumenthal,

Attorney General, State of Connecticut; the Division of Criminal Justice; the State of

Connecticut Department of Social Services ("DSS"); Michael Starkowski, Deputy Commissioner

of the Department of Social Services; H. Wayne Carver,[1] Connecticut State Medical Examiner;

Judge Robert Killian, Court of Probate, District of Hartford; Attorney Howard Hames;

Connecticut Community Care, Inc. ("CCCI"); Saint Francis Hospital; the Hebrew Home and

Hospital ("Hebrew Home"); Jewish Family Services; Interim Health Care Agency ("Interim");

---

[1] Although the Complaint names H. Wayne as a defendant, the State's moving papers identify this defendant as H. Wayne Carver. Accordingly, for purposes of this ruling, the Court refers to Defendant as H. Wayne Carver.

Gentiva Health Care Agency ("Gentiva")[2]; Jeff Burgess; and Dr. Gregory Isenberg.[3]  Now

pending are eleven motions to dismiss [Doc. Nos. 38, 129, 144, 174, 190, 191, 195, 199, 253,

257, and 259].  For the reasons that follow, these motions are **granted.**

## I.      BACKGROUND

The 120-page, 755-paragraph Complaint in this action appears to allege that various

defendants committed multiple civil rights violations, medical malpractice, and

Medicare/Medicaid fraud, and conspired to murder and murdered Margo Musayelova, Plaintiff

Jasmin Rzayeva's mother.  According to the Complaint, this is a case of "hate crime, health care

fraud, and murder" (compl. ¶ 28) committed by federally funded health care providers and their

Government co-conspirators, the majority of whom, the Complaint alleges, "are people of Jewish

origin, outspoken Zionists" who murdered Ms. Musayelova in retaliation for Ms. Rzayeva's

filing complaints of health care fraud with state and federal authorities and for her anti-Semitism.

(Id. ¶¶ 29, 88.)

According to the Complaint, when Ms. Musayelova was ill with cancer, she received

home health care services from Defendants Gentiva and Interim Health Care Agencies.  Plaintiffs

allege that Interim employees provided low quality care by violating proper hygiene procedures,

missing their scheduled visits, and leaving Ms. Musayelova without adequate nursing care.

(Compl. ¶¶ 36, 38-40.)  Because Gentiva and Interim continued to charge Medicare for

---

[2]  Although the Complaint names "Jentiva" Health Care as a defendant, Defendant Gentiva states that Plaintiffs have misspelled its name.  Accordingly, for purposes of this ruling, the Court adopts the spelling used by Defendant.

[3]  Although the Complaint names Dr. Gregory Izenberg as a defendant, Defendant identifies himself in his papers as Dr. Isenberg.  Accordingly, for purposes of this ruling, the Court adopts the spelling used by Defendant.

unperformed visits, Plaintiff Rzayeva complained to DSS and CCCI, but neither DSS nor CCCI adequately responded to her complaints.  Plaintiff alleges that DSS and CCCI participated in the health care fraud by approving payments for claims which they knew to be false and made for unperformed services.  (Id.. ¶ 37.)  To cover up this fraud and to retaliate against Ms. Rzayeva for her complaints, CCCI employees began to "sabotage" Ms. Musayelova's health care in various ways and disclosed Ms. Musayelova's health information in violation of federal.  (See id. ¶ 38-40, 42.)

On July 9, 2004, Michael Starkowski, Deputy Commissioner of the DSS, together with a a DSS social worker, several CCCI employees, and Dr. Gregory Isenberg, Ms. Musayelova's primary physician, petitioned the Court of Probate in Hartford, CT, to terminate Plaintiff Rzayeva's power of attorney, appoint an employee of DSS, Cassandra Henderson, to serve as Ms. Musayelova's temporary conservator and health care agent, and place Ms. Musayelova in the Hebrew Home & Hospital nursing facility.  (Compl. ¶ 46.)  The petitioners also asserted that Ms. Musayelova had never granted anyone power of attorney, was mentally incompetent, and was being abused by Plaintiff Rzayeva, who did not administer Ms. Musayelova's medication.  (Id. ¶¶ 47, 48.)  According to the Complaint, Judge Robert Killian appointed Ms. Henderson to be Ms. Musayelova's temporary conservator and health care agent in violation of Connecticut General Statute § 19a-576(d),[4] and Henderson abused her role as temporary conservator by secretly authorizing a "Do Not Resuscitate" order for Ms. Musayelova and failing to file with the court a

---

[4] Section 19a-576 provides in relevant part: "An administrator or employee of a government agency that is financially responsible for a person's medical care may not be appointed as a health care agent for such person.  This restriction shall not apply if such ... administrator or employee is related to the principal by blood, marriage, or adoption."  CONN. GEN. STAT. § 19a-576(d).

written report of her actions as conservator as required by Connecticut law. (Compl. ¶¶ 60, 61, 63.) The Complaint further alleges that Judge Killian violated Ms. Rzayeva's and Ms. Musayelova's civil rights by deciding ex parte to appoint a temporary conservatorship, without providing them the opportunity to be heard and without jurisdiction over issues in Ms. Musayelova's case relating to Medicare fraud and other federal issues. (Id. ¶¶ 101-03, ¶¶ 476-78.)

The crux of Plaintiffs' claims concerns an alleged conspiracy revolving around Ms. Musayelova's death in July, 2004. Plaintiffs allege that the medical staff of Hebrew Home & Hospital intentionally overdosed Ms. Musayelova with warfarin, a blood thinner medication improperly prescribed by Dr. Isenberg on July 1, 2004 as part of the overarching conspiracy to kill her. (Compl. ¶¶ 65, 542, 554.) On July 15, 2004, six days after Ms. Musayelova was placed at the Hebrew Home facility, she suffered a massive stroke and fell into a coma. Observing bruises on Ms. Musayelova's body, Ms. Rzayeva suspected that Ms. Musayelova had suffered a cerebral hemorrhage caused by a warfarin overdose, and she asked the Hebrew Home staff to call an ambulance to take Ms. Musayelova to the hospital. According to the Complaint, the Hebrew Home medics, pointing to the "Do Not Resuscitate" order authorized by Ms. Henderson, refused Plaintiff Rzayeva's request, thereby facilitating Ms. Musayelova's death. (Id. ¶ 68.) Plaintiffs allege that the attending physician at Hebrew Home falsely asserted in the discharge summary that Ms. Musayelova died of multi-organ system failure caused by her terminal cancer, deliberately and maliciously omitting Ms. Musayelova's bleeding disorder and warfarin therapy from the discharge summary. (Id. ¶ 69; see also id. ¶¶ 30, 70-78.) The summary discharge's attribution of Ms. Musayelova's death to cancer allegedly provided a false basis on which

-4-

Defendant H. Wayne Carver, the Connecticut State Chief Medical Examiner, denied Ms. Rzayeva's request for an autopsy.

Plaintiffs maintain that Ms. Musayelova's death resulted from a vast conspiracy perpetrated by various health care providers and government officials who discriminated against Plaintiffs and sought to retaliate against Ms. Rzayeva in order to cover up their ongoing Medicare/Medicaid fraud. According to Plaintiffs, employees of Defendant Saint Francis Hospital had twice previously tried to poison Ms. Musayelova (Compl. ¶¶ 94-95), and the forcible placement of Ms. Musayelova at the Hebrew Home was in part retaliation for Plaintiff Rzayeva's preventing the intentional overdose of Ms. Musayelova. (Id. ¶ 97.) Plaintiffs further allege that the federal government conspired with the health care provider defendants to cover up the facts surrounding Ms. Musayelova's death. After her mother's death, Ms. Rzayeva notified the FBI, the District of Connecticut U.S. Attorney's office, the State Division of Criminal Justice, and other state and federal agencies, and reported that her mother was murdered in connection with a health care fraud conspiracy. These various government officials either declined to investigate the matter or failed to return her calls. (Id. ¶¶ 107, 109-118.)

Plaintiffs attributes the alleged murder of Ms. Musayelova and the government's response to the workings of an alleged Zionist conspiracy. Plaintiffs contend that "Zionists," with "their collaborators of other nations," perpetuate health care fraud and are able to do so because they are "faced with well-organized State mafia consisting mostly of people of Jewish origin." (Compl. ¶ 92.) The Complaint boldly states that: "It is widely known fact, that being an ethnical [sic] minority in the USA the Jews are the majority in the USA government, including its law enforcement agencies, who very often cover up the crimes their Jewish tribesmen commit and

thus put their own nation above the law in connection with the Zionist idea that Jews are chosen race and can do whatever they want and other people shall meekly stand it." (Id. ¶ 126(a).)

In May, 2006, Plaintiffs filed this complaint bringing the following claims: (1) against the FBI and the DOJ for failure to investigate the alleged murder of Ms. Musayelova and the health care fraud allegedly perpetrated by the health care provider defendants (Compl. Count 1, ¶¶ 133-141); (2) against the FBI and the DOJ for violation of Ms. Rzayeva's and Ms. Musayelova's rights to due process and equal protection (id. Count 2, ¶¶ 142-48); (3) against the State Division of Criminal Justice for violation of Plaintiffs' civil rights for failing to investigate Ms. Musayelova's death on account of Plaintiffs' national origin (id. Count 3, ¶¶ 149- 54); (4) against Chief Medical Examiner H. Wayne for violating Plaintiffs' rights to equal protection for failure to perform the requested autopsy and by preventing them from performing traditional and religious burial rituals (id. Count 4, ¶¶ 155-65); (5) against DHHS and the DOJ for conspiracy to violate Plaintiffs' civil rights (id. Count 5, ¶¶ 166-183); (6) against the private health care provider defendants for violations of Plaintiffs' civil rights and other federal law and for conspiracy to violate their civil rights (id. Count 6, ¶¶ 184-201, and Count 8, ¶¶ 299-453); (7) against Hebrew Home for violation of federal health laws and the Fourteenth Amendment (id. Count 7, ¶¶ 202-298); (8) against Defendants Killian, Hames, Isenberg, Jewish Family Services, and DSS for violations of the 4th, 5th, 9th, and 14th Amendments (id. Count 9, ¶¶ 453-706); and (9) against the USA, the State of Connecticut, and "the Jewish Zionists of Hartford" for violation of Plaintiffs' human rights (Count 10, ¶¶ 707-755). Plaintiffs seek damages and injunctive relief compelling the FBI and the DOJ to conduct an investigation of Ms. Musayelova's death, compelling DHHS and its carriers and contractors to provide copies of all bills for services

rendered to Ms. Musayelova as well as any x-rays of her in their custody, and sanctioning the Secretary of DHHS for failure to disclose certain requested statements against its carriers and contractors.  Interim [Doc. No. 38], Hebrew Home [Doc. No. 129], Dr. Isenberg [Doc. No. 144], the USA, FBI, DOJ, DHHS, and Mr. Chen (collectively the "Federal Defendants") [Doc. No. 174] , Mr. Burgess [Doc. No. 190], Gentiva [Doc. No. 191], CCCI [Doc. No. 195], Jewish Family Services [Doc. No. 199], Attorney Hames [Doc. No. 253], Saint Francis Hospital [Doc. No. 257], and the State of Connecticut, Governor Rell, Attorney General Blumenthal, Division of Criminal Justice, DSS, Judge Killian, Mr. Starkowski, and Chief Medical Examiner Wayne (collectively the "State Defendants") [Doc. No. 259] each moves to dismiss the Complaint in its entirety pursuant to Rules 12(b)(1), 12(b)(5), 12(b)(6), and 41(b) of the Federal Rules of Civil Procedure.

## II.     STANDARDS OF REVIEW

### A.     Lack of Subject Matter Jurisdiction under Fed. R. Civ. P. 12(b)(1)

A case is properly dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate it.  FED. R. CIV. P. 12(b)(1); Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  Plaintiff, as the party asserting subject matter jurisdiction, has the burden of establishing that it exists, Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996) (citation omitted), and the Court should not draw argumentative inferences in her favor.  Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l, 968 F.2d 196, 198 (2d Cir. 1992) (citation omitted).  When considering a motion to dismiss for lack of subject matter jurisdiction, the court "must determine whether or not the factual predicate for subject matter exists."  Tilley v. Anixter Inc., 283 F. Supp. 2d 729, 733 (D. Conn. 2003) (citation

omitted).  In making a determination of a motion to dismiss under Rule 12(b)(1), a court is not

"limited to the face of the complaint, but may consider evidence, including affidavits submitted

by the parties."  Id. at 733 (citing Robinson v. Malaysia, 269 F.3d 133, 141 (2d Cir. 2001)).

### B.    Failure to State a Claim under Fed. R. Civ. P. 12(b)(6)

In determining a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all

factual allegations in the complaint as true and draw inferences from those allegations in the light

most favorable to the plaintiff."  Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329

(2d Cir. 1997).  "The issue is not whether the plaintiff will ultimately prevail but whether the

plaintiff is entitled to offer evidence to support the claims."  Villager Pond, Inc. v. Town of

Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S.

Ct. 1683 (1974) (internal quotations omitted)).  A district court should not grant a motion to

dismiss under Rule 12(b)(6) unless "it is clear that no relief could be granted under any set of

facts that could be proved consistent with the allegations."  H.J. Inc. v. Northwestern Bell Tel.

Co., 492 U.S. 229, 249-50 (1989) (internal citation omitted).  Furthermore, in deciding a Rule

12(b)(6) motion, the Court must confine its consideration "to facts stated on the face of the

complaint, in documents appended to the complaint or incorporated in the complaint by

reference, and to matters of which judicial notice may be taken."  Leonard F. v. Israel Disc. Bank

of N.Y., 199 F.3d 99, 107 (2d Cir. 1999) (citation and internal quotations omitted); Hayden v.

County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999).

### C.    Special Considerations for Pro Se Plaintiffs

As stated previously, Plaintiffs are proceeding pro se.  The Second Circuit has repeatedly

cautioned that because "most pro se plaintiffs lack familiarity with the formalities of pleading

requirements, [courts] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel." Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002) (citation and internal quotations omitted). The Second Circuit has also emphasized that "pro se litigants ... cannot be expected to know all of the legal theories on which they might ultimately recover," and, accordingly, "[i]t is enough that they allege that they were injured, and that their allegations can conceivably give rise to a viable claim." Phillips v. Girdick, 408 F.3d 124, 130 (2d Cir. 2005). It is up to the district court to determine what claims a pro se plaintiff's complaint could raise, and in doing so, "'the court's imagination should be limited only by [the plaintiff]'s factual allegations, not by the legal claims set out in his pleadings.'" Ford v. New Britain Trans. Co., Case No. 3:03cv150 (MRK), 2005 WL 1785269, at *1 (D. Conn. July 26, 2005) (quoting Phillips, 408 F.3d at 130). Importantly, however, the Court is not required to engage in "rank speculations" in an effort to manufacture a federal claim for pro se plaintiffs, Ford, 2005 WL 1785268 at *5, and thus, a court may dismiss a complaint if it appears beyond doubt that no set of facts could be proven that would establish an entitlement to relief. Weixel v. Bd. of Educ. of New York, 287 F.3d 138, 145-46 (2d Cir. 2002).

## III. DISCUSSION

### A. Plaintiffs' Motions to Strike

As a preliminary matter, the Court will address Plaintiffs' two pending Motions to Strike Defendants Interim's and Dr. Isenberg's motions to dismiss [Doc. Nos. 66 and 215]. In both of these motions, Plaintiffs merely reiterate the allegations made in the Complaint and the arguments put forth in their memoranda filed in opposition to Defendants' motions to dismiss.

Nowhere in either motion to strike do Plaintiffs demonstrate any reason why any particular portion of either Interim's or Dr. Isenberg's motion should be stricken. These motions are therefore denied, and the Court will consider Interim's and Dr. Isenberg's motions to dismiss in their entirety.

### B. Dismissal of Frivolous Claims

Before delving into the jurisdictional basis for each of Plaintiffs' claims, the Court will address the assertion made by several defendants that the Complaint should be dismissed in its entirety due to its frivolous nature. "When the court grants in forma pauperis status, [28 U.S.C. § 1915] requires the court to conduct an initial screening of the complaint to ensure that the case goes forward only if it meets certain requirements." Osuch v. Gregory, 303 F. Supp. 2d 189, 191 (D. Conn. 2004). Section 1915 provides that "the court shall dismiss the case at any time if the court determines that ... the action ... is frivolous or malicious; ... fails to state a claim on which relief may be granted; or ... seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). An action is frivolous when either "(1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted). In determining whether a complaint is frivolous, "a court is not bound, as it usually is when making a determination based solely on the pleadings, to accept without question the truth of the plaintiff's allegations." Denton v. Hernandez, 504 U.S. 25, 32 (1992). A Court may find a complaint factually frivolous "when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict

-10-

them."  Id.  Defendants Burgess, Isenberg, CCCI, Jewish Family Services, Howard Hames, and Saint Francis Hospital argue that the Complaint, alleging that twenty-five defendants–including several health care providers, the FBI, the Governor of Connecticut, the Attorney General of Connecticut, a probate judge, a federal prosecutor, and several other state and federal government officials–conspired to murder Ms. Musayelova, is the product of delusion or fantasy.

It would not be a stretch to conclude that many of Plaintiffs' allegations are factually baseless and the product of delusion.  The Complaint is a 733-paragraph diatribe, rife with anti-Semitic slurs, which asserts that the alleged conspirators were "Jewish Zionists" who murdered Ms. Musayelova, among other reasons, in retaliation for Ms. Rzayeva's being an anti-Semite. (Compl. ¶ 88.)  In particular, the conspiracy was allegedly perpetrated by a "well organized State mafia consisting mostly of people of Jewish origin, Zionists, who together with their collaborators of other nations were busy with earning of illegally increased salary upon health care fraud and being in comtempt [sic] with the clients' rights provided them with low quality of care and suppressed their complaints."  (Id. ¶ 92.)  The Complaint further states: "Everyone from the USA and State of Connecticut officials was deaf and dumb.  They covered up the murder committed by the Jewish Zionists."  (Id. ¶ 109; see also id. ¶¶ 126, 128-29 (claiming that Federal Defendants refused to investigate because Plaintiffs are "non-Jews"), 180-82 (claiming that Federal Defendants failed to provide the requested Medicare information based on a desire to protect Jewish "tribesmen."), 588, 714, 715, 718, 721, 730.)  Plaintiffs allege a civil rights violation based in part on the following accusations:

> a.  It is widely known fact that, being an ethnical minority in the USA the Jews are the majority in the USA government, including its law enforcement agencies, who very often cover up the crimes their Jewish tribesmen commit and thus put their own nation above the law in connection with the Zionist idea that the Jews are chosen race

> and can do whatever they want and other people shall meekly stand it.
> 　　　b.  It is known fact that Agent-in-Charge of FBI, State of Connecticut, Michael
> Wolf, are men of Jewish origin.  It is known from Internet website fact that defendant
> Shawn Chen, Assistant US Attorney, is surrounded by Jewish colleagues, Professors of
> Law....

(Id. ¶ 126.)  These base conclusions, while perpetuating classic anti-Semitic tropes regarding

international Zionist conspiracies, do nothing to assert legitimate legal claims.   The Second

Circuit has previously held that similar accusations of a "Jewish conspiracy" are frivolous.

See In re Martin-Trigona, 737 F.2d 1254, 1256 (2d Cir. 1984) (Plaintiff's "abuse of legal

processes is exemplified... by his recent use of pleading and other papers... as a vehicle to launch

vicious attacks upon persons of Jewish heritage.").

　　　In defense of their claims, Plaintiffs argue that Martin-Trigona is inapposite because it

dealt with "accusation[s] of all Jews in conspiracy" but not the "Zionist issues" raised by

Plaintiffs in this case.   (See, e.g., Pls.' Opp. to State Defs.' Mot. to Dismiss at 31; Pls.' Opp. to

Federal Defs.' Motion at 14-15.)  Plaintiffs' attempts to distinguish their anti-Semitic accusations

from those of earlier precedent on the basis of their derogatory use of the term "Zionist" only

beleaguer the issue and do not warrant a reasoned response from the Court.  Plaintiffs argue

nothing else to counter the charge of frivolity.  Rather, their briefing papers reassert their

conclusory allegations and spew further anti-Semitic vitriol, this time complete with a melee of

demeaning homophobic, sexist, and otherwise inappropriate epithets.  The Court is compelled to

state that Plaintiffs' hateful rants provide no basis for any viable legal claims and are most

unwelcome in this Court.   Nonetheless, because the Court did not dismiss this action sua sponte

before the extensive briefing done in connection with the pending motions, it will review in turn

the other arguments raised in Defendants' motions to dismiss.

**C.** **Dismissal for Lack of Jurisdiction**

*1.* *Federal Defendants*

The Federal Defendants move to dismiss Plaintiffs' claims against them for lack of

jurisdiction. In addition to adhering to the standard set forth in Fed. R. Civ. P. 12(b)(1), in an

action in which the United States or its agencies is a defendant, the plaintiff must also show that

there has been a waiver of sovereign immunity. "Sovereign immunity is a jurisdictional bar, and

a waiver of sovereign immunity is to be construed strictly and limited to its express terms."

Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003) (citing Dep't of the Army v. Blue

Fox, Inc., 525 U.S. 255, 261 (1999) and Up State Fed. Credit Union v. Walker, 198 F.3d 372,

374 (2d Cir. 1999)); see also United States v. Mitchell, 463 U.S. 206, 212 (1983) ("the existence

of consent is a prerequisite for jurisdiction."); Dotson v. Griesa, 398 F.3d 156, 177 (2d Cir.

2005). In the absence of such a waiver, "sovereign immunity shields the Federal Government

and its agencies from suit." Lunney, 319 F.3d at 554 (quoting Dorking Genetics v. United States,

76 F.3d 1261, 1263 (2d Cir. 1996)). Neither the federal question statute, 28 U.S.C. § 1331, nor

the Constitution operates in and of itself as a waiver of sovereign immunity. Doe v. Civiletti,

635 F.2d 88, 94 (2d Cir. 1980); see also Garcia v. United States, 666 F.2d 960, 966 (Former 5th

Cir.), cert. denied, 459 U.S. 832 (1982). Plaintiffs have not alleged that the federal agencies

named in this suit—the USA, the FBI, the DOJ, and DHHS—have consented to suit in this

action, and the government has not conceded as much. Accordingly, Plaintiffs' claims against

the USA, the FBI, the DOJ, and DHHS are barred by the government's sovereign immunity and

must be dismissed.

Even if the United States had consented to this suit, Plaintiffs have failed to establish that

the Court has jurisdiction to compel the Federal Defendants to investigate Ms. Musayelova's death or disclose any further information.  Plaintiffs allege in their Complaint that the failure of the DOJ and the FBI to investigate the circumstances of Ms. Musayelova's death was in violation of federal law, including 18 U.S.C. § 3771, and that the DOJ and the FBI violated Plaintiffs' civil rights by failing to investigate the death, and they now seek an order from this Court compelling the federal government to conduct a criminal investigation.  (Compl. ¶¶ 25-29.)  As this Court held in Plaintiffs' earlier related suit, Estate of Musayelova v. Kataja, Civ. No. 3:06CV881 (PCD), 2006 WL 3246779, at *4 (D. Conn. Nov. 7, 2006), this Court lacks jurisdiction to order federal agents to initiate a prosecution.  Plaintiffs have also not established that they have standing to advance these claims.  Plaintiffs must show that they have standing by showing that they suffered a distinct injury that can be traced to the Federal Defendants' refusal to investigate their allegations or the failure to provide them with certain information, and they must show that such injury would be redressed by a favorable court decision.  See Cisneros v. Reno, No. 95 Civ. 8205(RPP), 1996 WL 18874, at *2 (S.D.N.Y. Jan. 19, 1996) (citations omitted); see also Valley Forge v. Americans United, 454 U.S. 464, 472 (1982).  Plaintiffs have not satisfied this burden, and they have not shown that an order compelling government action would redress their injuries.  Id.  Plaintiffs have therefore not shown that an actual case or controversy involving the Federal Defendants exists over which this Court has jurisdiction.  Accordingly, Plaintiffs' claims against the Federal Defendants must be dismissed for lack of jurisdiction.

### 2. *State Defendants*

The State Defendants—the State of Connecticut, Governor Rell, Attorney General Blumenthal, the Division of Criminal Justice, the Department of Social Services, Michael

Starkowski, H. Wayne Carver, and Judge Killian —also move to dismiss all claims against them for lack of jurisdiction. The Eleventh Amendment has been interpreted to bar lawsuits by citizens against a state unless that state has consented to suit or Congress has overridden that immunity by statute. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 68 (1996); Nat'l Foods, Inc. v. Rubin, 936 F.2d 656, 658-59 (2d Cir. 1991). This immunity from suit extends to state agencies and state branches of government, and to state officials engaged in official actions who are sued for damages. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Ford v. Reynolds, 316 F.3d 351, 354-55 (2d Cir. 2003). Here, Plaintiffs do not allege that the State of Connecticut has consented to suit in federal court in this matter, and the State Defendants contend that no permission to sue has been granted. Accordingly, the Eleventh Amendment bars Plaintiffs' claims against the State, the Division of Criminal Justice, the Department of Social Services, and claims for damages brought against Governor Rell, Attorney General Blumenthal, Mr. Starkowski, Dr. Carver, and Judge Killian in their official capacities. Plaintiffs' reference to 28 U.S.C. § 1343 in their opposition to the State's motion to dismiss does not release them from the bar to their claims against the State and its agencies. Section 1343, which confers original jurisdiction on federal courts to hear § 1983 claims, does not supply a basis or a claim for relief, see Howell v. Cataldi, 464 F.2d 272, 274 (3d Cir. 1972); therefore it cannot save Plaintiffs' claims against the State from its Eleventh Amendment immunity.

To the extent Plaintiffs assert civil rights claims against the State Defendants brought pursuant to 42 U.S.C. § 1983, these claims must be dismissed because neither a state nor any of its agencies is a "person" under § 1983. Hafer v. Melo, 502 U.S. 21, 26 (1991); Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989). The Supreme Court has clearly stated that § 1983

"creates no remedy against a State."  Arizonans for Official English v. Arizona, 520 U.S. 43, 69

(1997); see also Spencer v. Doe, 139 F.3d 107, 111 (2d Cir. 1998).  In addition, to the extent that

the individual state officer defendants were sued in their official capacity, they are not "persons"

under § 1983 either.  Id.  Accordingly, Plaintiffs' claims of civil rights violations against the

State of Connecticut, the Division of Criminal Justice, the Department of Social Services, and the

individual state officers to the extent they were sued in their official capacities lack an arguable

legal basis under § 1983 and must be dismissed.

### 3. *Dismissal Pursuant to Fed. R. Civ. P. 12(b)(5) for Improper Service*

Defendants Gentiva, CCCI, Saint Francis Hospital, Shawn Chen, H. Wayne Carver,

Judge Robert Killian, and Michael Starkowski move to dismiss  pursuant to Rule 12(b)(5) of the

Federal Rules of Civil Procedure for insufficiency of service of process.  Under Rule 12(b)(5), a

party may file a motion to dismiss due to insufficiency of service of process.  FED. R. CIV. P.

12(b)(5); see also Greene v. Wright, 389 F. Supp. 2d 416, 426 n.2 (D. Conn. 2005) ("A Rule

12(b)(5) motion is the proper vehicle for challenging ... the lack of delivery of the summons and

complaint." (quoting 5B CHARLES ALLAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE

AND PROCEDURE § 1353, at 334 (3d ed. 2004))).  A motion to dismiss pursuant to Rule 12(b)(5)

must be granted if the plaintiff fails to serve a copy of the summons and complaint on the

defendants pursuant to Rule 4 of the Federal Rules, which sets forth the federal requirements for

service.  Cole v. Aetna Life & Cas., 70 F. Supp. 2d 106, 110 (D. Conn. 1999).  "Once validity of

service has been challenged, it becomes the plaintiff's burden to prove that service of process

was adequate."  Id.

Defendants Gentiva and CCCI are entitled to dismissal because they were not served in

compliance with Rule 4. Rule 4(m) provides that:

> If the service of a summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time....

District courts are thus specifically authorized to dismiss lawsuits for failure to comply with the service requirements of Rule 4, which makes it clear that it is the plaintiffs' burden to ensure that service is completed in a timely fashion. See Fed. R. Civ. P. 4(c)(1); Barclay v. Michalsky, 451 F. Supp. 2d 386, 393 (D. Conn. 2006); Petrolito v. 1st Nat'l Credit Servs. Corp., No. Civ.A. 3:03CV1085 (CFD), 2005 WL 33174, at *1 (D. Conn. Feb. 2, 2005) (dismissing the complaint for failure to adhere to the 120-day time frame and for failure to seek out an extension of time to serve the complaint). In this case, Plaintiffs filed their Complaint on June 7, 2006. [Doc. No. 4.] Pursuant to Rule 4(m), they had 120 days–until October 5, 2006–to serve the defendants. They did not serve CCCI with a complaint until November 22, 2006 (see CCCI's Mot. to Dismiss Ex. A; Doc. No. 52), and they did not serve CCCI with a summons as required by Rule 4. (CCCI's Mot. to Dismiss at 5.) They also failed to serve Gentiva until November 27, 2006, 163 days after filing. (See Doc. No. 52.) Plaintiffs therefore failed to properly serve Gentiva and CCCI, and the claims against them are dismissed pursuant to Rule 12(b)(5).

Defendant CCCI also moves to dismiss pursuant to Rule 12(b)(5) on the ground that Plaintiffs did not serve an individual who could accept service of process on behalf of CCCI pursuant to applicable law. Defendant CCCI is a domestic corporation domiciled in Connecticut. (See CCCI's Mot. to Dismiss Ex. B.) Rule 4(h), "Service upon Corporations and Associations," provides:

> Unless otherwise provided by federal law, service upon a domestic... corporation..., and

> from which a waiver of service ha not been obtained and filed, shall be effected: (1) in a judicial district of the United States in the manner prescribed for individuals by subdivision (e)(1), or by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requries, by also mailing a copy to the defendant....

Fᴇᴅ. R. Cɪᴠ. P. 4(h). Rule 4(e)(1) provides:

> Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed... may be effected in any judicial district of the United States: (1) pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State....

Fᴇᴅ. R. Cɪᴠ. P. 4(e)(1). Accordingly, Plaintiffs in this case could effectuate service on CCCI pursuant to either Rule 4 or Connecticut General Statute § 52-57(c), which provides in relevant part:

> In actions against a private corporation, service of process shall be made either upon the president, the vice president, an assistant vice president, the secretary, the assistant secretary, the treasurer, the assistant treasurer, the cashier, the assistant cashier, the teller or the assistant teller or its general or managing agent or manager or upon any director resident in this state, or the person in charge of the business of the corporation or upon any person who is at the time of service in charge of the office of the corporation in the town in which its principal office or place of business is located....

Even if service were timely made, Plaintiffs failed to comply with Rule 4 or § 52-57. A plaintiff bears the burden of establishing a basis of an inference that Defendant authorized a particular person to accept service of process on its behalf. Nature's First Inc. v. Nature's First Law, Inc., 436 F. Supp. 2d 368, 372 (D. Conn. 2006) (citations omitted). Here, Plaintiffs served Gayle Kataja, Regional Director of CCCI, with the Complaint. (See CCCI's Mot. to Dismiss Ex. A.) Ms. Kataja is not an officer, a managing or general agent, or an agent authorized by appointment or by law to receive service of process for CCCI (id. Exs. A, B), and her position as Regional Director does not fit any of the categories of individuals enumerated in § 52-57 who can accept

-18-

service of process for a complaint.  Further, Ms. Kataja was not served with a summons.  For these reasons, the Plaintiffs have insufficiently served Defendant CCCI, and so the Court lacks personal jurisdiction over it.  Accordingly, the Complaint against Defendant CCCI is dismissed.

Saint Francis Hospital contends that, rather than being served with a summons, it received only a Notice of Lawsuit and Request for Waiver of Service of Summons along with the Complaint.  Saint Francis did not execute this document or waive service by other means.  (See Def. Saint Francis's Mot. to Dismiss at 3.)  Accordingly, Plaintiffs were required to comply with Rule 4(h) in effecting service on Saint Francis Hospital, but they failed to do so.  Even if the Court were to construe the Notice of Lawsuit as "service," it was not completed within 120 days from the filing of the Complaint as required by Rule 4(m).  Plaintiffs had until only October 5, 2006 to serve parties with the summons and complaint, and they did not "serve" Saint Francis with the Notice of Lawsuit until November 27, 2006.  (See id., Ex. A; Doc. No. 52.)  Plaintiffs do not object to Saint Francis's contentions that it was not properly served; instead, Plaintiffs simply blame the U.S. Marshals for not ensuring proper service on Saint Francis.  (Pls.' Opp. to Saint Francis's Mot. to Dismiss at 2-3.)  Other than their conclusory statements shifting blame to the U.S. Marshals, Plaintiffs make no showing that the delay in service on Saint Francis was somehow excusable.  Plaintiffs therefore fail to meet their burden of establishing proper service, and their claims against Saint Francis are therefore dismissed pursuant to Rule 12(b)(5) for insufficient service of process.

To the extent Plaintiffs have named Defendant Chen in his individual capacity (see Compl. ¶ 9), Plaintiffs failed to make proper service of process.  Rule 4(e) of the Federal Rules of Civil Procedure requires that, where an employee is sued in his individual capacity, service

must be made by "delivering a copy of the summons and of the complaint to the individual

personally or by leaving copies thereof at the individual's dwelling house or usual place of

abode... or by delivering a copy of the summons and of the complaint to an agent authorized by

appointment or by law to receive service of process." FED. R. CIV. P. 4(e)(2). Plaintiffs served a

copy of the summons and complaint regarding Mr. Chen at the U.S. Attorney's Office in New

Haven (see Doc. No. 12), but, according to Defendants, Mr. Chen is no longer employed at this

office and there is no indication that he was personally served at any other location. In response

to the Federal Defendants' motion, Plaintiffs contend that they had no choice but to serve Chen at

the U.S. Attorney's office because they could not find his home address, but service at home is

not the only method provided by Rule 4(e). See FED. R. CIV. P. 4(e)(2) (also providing for

service by delivery of summons personally to the individual or to agent authorized by

appointment or by law to receive service of process.) Although Plaintiffs might not have known

where to locate Defendant Chen if they did not know his home address, such ignorance is not a

valid reason for departing from their procedural obligations under the Federal Rules.

Furthermore, even if he had been properly served, Plaintiff cannot sue Mr. Chen in his

individual capacity for actions taken within the scope of his official duties. A federal agent may

be personally liable for committing constitutional violations on the theory that such conduct falls

outside the scope of his official capacities. See Bivens v. Six Unknown Federal Narcotics

Agents, 403 U.S. 388 (1971). However, nothing in Plaintiffs' Complaint alleges that Mr. Chen

acted outside the scope of his employment. According to the Complaint, Plaintiffs wrote to the

U.S. Attorney's Office in June and July, 2004, requesting an investigation into Ms. Musayelova's

death (Compl. ¶ 109), and Mr. Chen responded to Plaintiffs by letter dated October 1, 2004,

indicating that the U.S. Attorney's Office did not appear to have jurisdiction to refer the matter for criminal investigation. (Id. ¶¶ 116-18.) Because nothing here alleges that Mr. Chen acted outside the scope of his employment, Plaintiffs' claims against him in his individual capacity are dismissed.

To the extent State Defendant H. Wayne Carver, Judge Robert Killian, or Michael Starkowski are sued in their individual capacities, these claims must also be dismissed for lack of personal jurisdiction. The executed summonses filed with the Court (see Doc. 52) show that none of these three defendants was personally served in compliance with Rule 4(e)(2). Defendants Starkowski and Judge Killian were served at the Office of the Attorney General; a summons and complaint was left with an executive secretary of Defendant Carver. Although such service complies with Rule 4 for suit against these defendants in their official capacities, it does not suffice for the purpose of holding them individually liable for any of the Plaintiffs' claims. Accordingly, to the extent Plaintiffs assert claims against Defendants Starkowski, Carver, and Judge Killian in their individual capacities, these claims are dismissed pursuant to Rule 12(b)(5) for insufficient service of process.

### 4. *Dismissal of Claims Brought on Behalf of Ms. Musayelova's Estate*

Multiple Defendants move to dismiss all claims brought on behalf of the Estate of Margo Musayelova because Plaintiffs Rzayeva and Bagdasaryan lack standing to bring suit on behalf of the estate and therefore the Court lacks jurisdiction over such claims. Standing is a jurisdictional prerequisite to a federal court's deliberations. Lerner v. Fleet Bank, N.A., 318 F.3d 113, 126 (2d Cir. 2003). Standing, like other jurisdictional inquiries, must affirmatively appear on the record, and, to that end, "it is the burden of the party who seeks the exercise of jurisdiction in his favor...

clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." Thompson v. County of Franklin, 15 F.3d 245, 249 (2d Cir. 1994) (citations and internal quotation marks omitted); see also Warth v. Seldin, 422 U.S. 490, 518 (1975).

In this case, pro se litigants Rzayeva and Bagdasaryan have filed suit on behalf of the Estate of Margo Musayelova. However, because "pro se" means to appear for one's self, "a person ordinarily may not appear pro se in the cause of another person or entity." Pridgen v. Andresen, 113 F.3d 391, 393 (2d Cir. 1997); see also Iannaccone v. Law, 142 F.3d 553, 558 (2d Cir. 1998). The Second Circuit has held that "an administratrix or executrix of an estate may not proceed *pro se* when the estate has beneficiaries or creditors other than the litigant." Pridgen, 113 F.3d at 393. When an estate has other beneficiaries or creditors, it cannot be described as the litigant's own "because the personal interests of the estate, other survivors, and possible creditors will be affected by the outcome of the proceedings." Id. (internal citations omitted). Plaintiff Rzayeva presents herself as the personal representative of the Estate of Margo Msayelova, but she does not set forth any allegations that she is the sole beneficiary and that there are no creditors. She also does not set forth any allegations that she is the administratrix or executrix of her late mother's estate. Rzayeva is thus barred from proceeding pro se in this action to litigate any claims on behalf of the Estate of Margo Musayelova. To the extent Plaintiffs' claims are on behalf of the Estate of Margo Musayelova, they are hereby dismissed.

Plaintiff Rzayeva responded to the motions to dismiss on this ground in part by filing a Motion to Appoint Counsel for the Estate and for Plaintiff Bagdasaryan [Doc. No. 212]. This motion is denied given the weakness of Plaintiffs' claims. District courts have wide discretion in determining whether to appoint counsel to indigent claimants pursuant 28 U.S.C. § 1915, Hodge

v. Police Officers, 802 F.2d 58, 60 (2d Cir. 1986), but they "should not grant such applications indiscriminately." Curtis v. Rowland, No. Civ. 3:00CV1378 (PCD), 2001 WL 789318, at *1 (D. Conn. Feb. 1, 2001) (quoting Cooper v. A Sargenti Co., 877 F.2d 170, 172 (2d Cir. 1989)). While the statute governing appointment of counsel must be understood as guaranteeing indigents reasonable access to the courts, it is clear that appointment of counsel is not always required. In determining whether to appoint counsel for an indigent litigant, a district court judge should first consider "whether the indigent's position seems likely to be of substance." Machadio v. Apfel, 276 F.3d 103, 107 (2d Cir. 2002) (citing Hodge, 802 F.2d at 61). Where "the plaintiff's claims are so highly dubious that a judge cannot properly ask a member of the bar to assume this thankless burden," or where a plaintiff's chances of success are "extremely slim," appointment of counsel is properly denied. Hodge, 802 F.2d at 60 (internal citations omitted). In this case, it has been clear that Plaintiffs' chances of success are extremely slim: as discussed above and for the reasons stated below, Plaintiffs' claims are subject to dismissal for the various reasons articulated in Defendants' pending motions. In addition to failing to resolve the issue of Plaintiff Rzayeva's standing to sue on behalf of her mother's estate, appointment of counsel for the Estate of Ms. Musayelova would not save the Plaintiffs' meritless claims from dismissal. Plaintiff Rzayeva's motion to appoint counsel is therefore denied.

### 5.    *Dismissal of Medicaid/Medicare Fraud Claim for Lack of Standing*

Defendants Interim, Hebrew Home, Burgess , Gentiva, CCCI , and Saint Francis Hospital also move to dismiss Plaintiffs' claims of Medicaid/Medicare fraud for lack of standing. No private cause of action exists under the federal health care fraud statute, 42 U.S.C. § 1320a-7b; only the federal government may bring lawsuits for the recovery of loss caused by alleged

Medicare fraud:

> The case law is well settled that decisions by the Secretary not to investigate or prosecute an individual based upon alleged violations of the Medicare Act are discretionary and non-reviewable. Heckler v. Chaney, 470 U.S. 821, 831 (1985). As the Act does not afford a Medicare beneficiary the right to a hearing or other cognizable claim for the purpose of establishing Medicare fraud on the part of the provider, the plaintiff's claim is not reviewable and must be dismissed.

Keels v. Sec'y of HHS, No. C/A 3:01-4864-17BD, 2003 WL 22843160, at *2 (D. S.C. Feb. 6, 2003). See also Donovan v. Rothman, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000) ("There is no private cause of action to redress violations of ... § 1320a-7b[.]" (citations omitted)); United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 28, 37 (D.D.C. 2003) (granting 12(b)(6) motion to dismiss Medicare fraud claim brought by private parties); Action Ambulance Serv., Inc. v. Atlanticare Health Servs., Inc., 815 F. Supp. 33, 40 (D. Mass. 1993). Although private citizens may bring a federal health care fraud claim by way of a qui tam action in which the government may choose to investigate and intervene, see, e.g., United States ex rel. Tiesinga v. Dianon Sys., Inc., 231 F.R.D. 122 (D. Conn. 2005); In re Cardiac Devices Qui Tam Litig., 221 F.R.D. 318 (D. Conn. 2004), Plaintiffs have not met the strict procedural requirements of the False Claims Act, 31 U.S.C. §§ 3729 et seq., which enables individuals to bring a qui tam action. See 31 U.S.C. § 3730(b); see also In Re Cardiac Devices, 221 F.R.D. at 324 n.6, rev'd on other grounds, United States v. Baylor Univ. Med. Ctr., 469 F.3d 263 (2d Cir. 2006). Plaintiffs are also not aggrieved insurers who may bring an individual claim of health care fraud against a company pursuant to the Connecticut Health Insurance Fraud Act, CONN. GEN. STAT. §§ 53-440 et seq. Because the Plaintiffs do not have standing to invoke a cause of action for Medicare and Medicaid fraud, the Court lacks subject matter jurisdiction over these claims and they must be dismissed.

Even if Plaintiffs had a private cause of action, Plaintiffs have failed, as Defendant Gentiva argues, to allege fraud with particularity as required by Fed. R. Civ. P. 9(b). Rule 9(b) requires that in "all averments of fraud," the circumstances "shall be stated with particularity." To satisfy this standard, a party "must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989) (citing Goldman v. Belden, 754 F.2d 1059, 1069-70 (2d Cir. 1985)). On a motion to dismiss, the Court must read the complaint generously and draw all inferences in favor of the plaintiff. Id. (citing Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 562 (2d Cir. 1985)). Here, Plaintiffs allege only that Gentiva "got involved into the schemes" to engage in Medicare fraud (Compl. ¶ 631) and that Defendants Isenberg, Gentiva, DSS, CCCI, Hebrew Home, and the State "cheated on the USA government" in connection with Plaintiffs' requests to disclose Ms. Musayelova's health care bills. (Id. ¶ 191.) Such blanket accusations do not meet the requirements of Rule 9(b). Although the Complaint contains lengthy allegations of falsified diagnoses and fraudulent records made by "health care professionals and providers who were involved in the conspiracy to kill my mother" (id. ¶ 189), the allegations do not attribute any specific acts to any particular defendant. Such vague generalizations fall short of the stringent pleading requirement set forth in Rule 9(b), and Plaintiffs' health care fraud claims would therefore fail on that basis as well.

In response to Defendants' motions to dismiss the health care fraud claims for lack of standing, Plaintiffs argue that these claims actually relate to the alleged wrongful death of Ms. Musayelova and that they are entitled to bring a civil suit for damages for her wrongful death

after the government declined to investigate her death and prosecute anyone for homocide.

Although Plaintiffs are correct that, in general, private citizens may pursue civil wrongful death litigation after the resolution of a criminal matter, and that the evidentiary standard in such litigation will be "a preponderance of evidence" rather than "beyond a reasonable doubt," a plaintiff must still meet certain standing requirements in order to pursue such litigation in federal court. A further discussion of Plaintiffs' wrongful death claims is included below. Insofar as Plaintiffs bring claims of Medicare fraud in this action, however, they have not met the necessary standing requirements to pursue those claims, and these claims are therefore dismissed.

**D.** **Dismissal Pursuant to Rule 12(b)(6) for Failure to State a Claim**

Various defendants move to dismiss each of Plaintiffs' claims pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The Court will consider each subset of Plaintiffs' claims in turn.

*1.* ***Constitutional Claims***

Plaintiffs bring numerous claims pursuant to 42 U.S.C. § 1983 to recover for various "civil rights violations." (See Compl. Counts 2-4, 6-9.) These claims fail for several reasons. First, Plaintiffs have no basis for asserting these claims against the private defendants. Section 1983 provides a cause of action for damages against any person who, acting under the color of state law, deprives another of a right, privilege, or immunity secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. To state a claim under § 1983, Plaintiffs must show that they were injured by either a state actor or a private party acting under color of state law. Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002); see also Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982) (in an action alleging § 1983 violation, "[i]f the action of the

respondent ... is not state action, our inquiry ends."). Ostensibly private conduct can be fairly attributed to the state only if there is "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)); see also Tancredi v. Metro. Life Ins. Co., 316 F.3d 308, 312-13 (2d Cir.), cert. denied, 539 U.S. 942 (2003). Plaintiffs have not alleged that private health care provider defendants CCCI, St. Francis Hospital, Hebrew Home, Jewish Family Services, Interim, or Gentiva are state agencies, nor that they may be treated as state actors for purposes of the Plaintiffs' civil rights claims. The only connection between these Defendants and the State alleged in the Complaint is that they participate in the Medicare and Medicaid programs. However, a private provider's acceptance of Medicare or Medicaid does not create the necessary nexus to support a § 1983 claim. Blum v. Yaretsky, 457 U.S. 991, 1011 (1982); Wagner v. Sheltz, 471 F. Supp. 903, 907-08 (D. Conn. 1979); Alexander v. Pathfinder, Inc., 189 F.3d 735, 740 (8th Cir. 1999); Mendez v. Belton, 739 F.2d 15, 18 (1st Cir. 1984); Amofa v. Bronx-Lebanon Hosp. Ctr., No. 05 CIV. 9230 (SHS), 2006 WL 3316278, at *4 (S.D.N.Y. Nov. 13, 2006). Even if Plaintiffs were to show that these private defendants were state actors for purposes of the Fourteenth Amendment, the Fourth, Fifth, and Ninth Amendments are wholly inapplicable to private conduct, see United States v. Jacobsen, 466 U.S. 109, 113 (1984) ("The Fourth Amendment ... is wholly inapplicable to actions taken by private citizens," quoting Walter v. United States, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)); Rini v. Zwirn, 886 F. Supp. 270, 289 (E.D.N.Y. 1995) (the "Fifth Amendment in and of itself pertains only to actions of the federal government," and "no independent constitutional

protection is recognized which derives from the Ninth Amendment.").  Plaintiffs' claims under

those amendments against the private defendants therefore must fail.

Plaintiffs also do not allege that the individual private defendants, Burgess, Isenberg, or

Hames, were either state actors or may be fairly treated as state actors for purposes of the § 1983

claims.  Although the Complaint alleges that Attorney Hames acted as a court-appointed

conservator and attorney for Ms. Musayelova, such conduct does not constitute state action in

this context.  "It is well-established that court-appointed attorneys performing a lawyer's

traditional functions as counsel... do not act 'under color of state law' and therefore are not

subject to suit under 42 U.S.C. § 1983."  Rodriguez v. Weprin, 116 F.3d 62, 65-66 (2d Cir.

1997).  Because a court-ordered conservator exercises independent professional judgment in the

interest of his client, he cannot be considered a state actor.  Storck v. Suffolk County Dep't of

Social Servs., 62 F. Supp. 2d 927, 941 (E.D.N.Y. 1999) ("When considering the state action

requirement of a court-appointed representative, courts focus on whether the duty of the person

appointed runs to the state or the individual client"); see also Meeker v. Kercher, 782 F.2d 153,

155 (10th Cir. 1986) (guardian at litem is not a state actor for purposes of § 1983 because he

assumes no "'obligation to the mission of the state'" and instead "owes his or her undivided

loyalty to the minor, not the state." (quoting Polk County v. Dodson, 454 U.S. 312, 320 (1981))).

The fact that an individual is appointed by the state and paid with state funds is insufficient to

render an individual a state actor.  Storck, 62 F. Supp. 2d at 941-42.  Therefore, neither Attorney

Hames nor Defendants Burgess or Isenberg were acting under color of state law, and the civil

rights claims against them must be dismissed.

In their opposition to Defendants' various motions to dismiss the civil rights claims,

Plaintiffs assert that included within their constitutional rights under the Fourth, Fifth, Ninth, and Fourteenth Amendments are the right to be free from torment, the right to a "good name and reputation," the right to "familial companionship," the right to the detection and prosecution of crimes, and the right to sue on behalf of the Estate of Margo Musayelova. (See, e.g., Pls.' Opp. to Def. Isenberg's Mot. to Dismiss at 14-15.) In addition to the fact that these claims were not brought in the Complaint and therefore should not be considered by the Court, these "rights" are not, as Plaintiffs contend, protected by the Constitution. Plaintiffs' arguments therefore fail to state a constitutional claim upon which relief can be granted and do not save their civil rights claims from dismissal.

### 2. Conspiracy Claims

Plaintiffs appear to allege pursuant 42 U.S.C. §§ 1983 and 1985 that Defendants conspired to deprive them of their civil rights. Section 1985 provides in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... if one or more persons ... do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is ... deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages....

42 U.S.C. § 1985(3). In order to survive a motion to dismiss a § 1983 conspiracy claim against a private entity in the Second Circuit, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello, 292 F.3d at 324-25. Complaints containing only conclusory, vague, or general allegations that the defendants engaged in a conspiracy to deprive the plaintiffs of constitutional rights must be dismissed, and "diffuse

and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Id. at 325 (internal citations omitted); see also De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996). Although Plaintiffs generally assert that a network of conspirators exists among Jeff Burgess, HealthTrac, Hebrew Home, Cassandra Henderson, and others to deprive Plaintiffs of their civil rights by sending Ms. Musayelova to Hebrew Home, they allege no facts to establish that the private defendants entered an agreement with the state actors to inflict a particular unconstitutional injury upon them. Plaintiffs' vague and conclusory allegations against the private "conspirators" are entirely unclear, unsupported by facts, and insufficient to substantiate their claims.

Furthermore, to bring a claim of conspiracy to violate their civil rights, Plaintiffs must allege that they belong to a protected class. Section 1985(3) "is applicable only if the plaintiff can show that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 426-27 (2d Cir. 1995) (internal citations omitted); see also Gleason v. McBride, 869 F.2d 688, 694-95 (2d Cir. 1989) (citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971)). Plaintiffs here allege that they were discriminated against because they were anti-Semites, but no court has recognized this as a legitimate class under § 1985. Membership in non-racial, political classes generally cannot serve as a basis for § 1985 claims. See United Bhd. of Carpenters & Joiners of Amer., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 836 (1983) (apart from racial animus, political affiliation does not create cognizable class membership under § 1985); Gleason v. McBride, 869 F.2d 688, 695 (2d Cir. 1989) (same). Plaintiffs do assert that they are of Armenian national origin, and their allegations may be construed to state discrimination on the basis of national

origin, a cognizable class for purposes of § 1985 claims. However, even if Plaintiffs belong to a

cognizable class, they fail to allege any facts showing a connection between Defendants' alleged

discriminatory animus and their alleged unconstitutional conduct. See Platsky v. Kilpatrick, 806

F. Supp. 358 (E.D.N.Y. 1992) (even if membership in the Socialist party created a protected class

under § 1985, plaintiff's claim failed for failure to establish a connection between his political

beliefs and defendant's actions). Plaintiffs' conspiracy claims brought against the private

defendants therefore fail to state a claim under § 1985(3) and are hereby dismissed.

Plaintiffs' conspiracy claims brought against the Federal Defendants must also be

dismissed. The Complaint contains vague and conclusory allegations against the Federal

Defendants, riddled with anti-Semitic accusations, do not state a claim for relief. Complaints

containing only "conclusory, vague or general allegations" of a government conspiracy to deprive

a plaintiff of her constitutional rights will not survive a motion to dismiss. Bloom v. U.S.

Government, No. 02CIV2352DABDF, 2003 WL 22327163, at *4 (S.D.N.Y. Oct. 10, 2003)

(citing Sommer v. Dixon, 709 F.2d 173, 175 (2d Cir. 1983) (per curiam) and Gyadu v. Hartford

Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999)). To establish a conspiracy claim, Plaintiffs must

"provide a basis in fact" by "pleading particular overt acts performed in furtherance of the

conspiracy," Bloom, 2003 WL 22327163, at * 4 (citations omitted), and a conspiracy claim must

be dismissed pursuant to Rule 12(b)(6) if a plaintiff does not advance any facts establishing how

the Government or its agents "entered willfully into an agreement to commit ... unlawful acts

against Plaintiff." Id. at *5. In this case, Plaintiffs have asserted that the Federal Defendants'

refusal to investigate the death of Ms. Musayelova or to disclose certain information was

motivated by their conspiratorial desire to punish Plaintiffs because of their national origin and to

protect unnamed Jewish conspirators in other federal agencies.  Despite these broad accusations, Plaintiffs did not plead particular facts showing that the Federal Defendants entered an agreement to violate Plaintiffs' rights or that they took concrete steps in furtherance of such an agreement. Accordingly, Plaintiffs' conspiracy claims against the Federal Defendants are also dismissed for failure to state a claim pursuant to Rule 12(b)(6).

### 3.      HIPAA Claim

Plaintiffs claim that Gentiva's failure to provide them with certain health insurance forms constitutes a violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. §§ 1320 et seq. and 45 C.F.R. §§ 160-64.  (Compl. ¶¶ 181, 200(a).)  HIPAA, which regulates the privacy of medical records, provides no private right of action, and enforcement of HIPAA is reserved exclusively to the Secretary of Health and Human Services.  Acara v. Banks, 470 F.3d 569, 571 (5th Cir. 2006) (citing 42 U.S.C. §§ 1320d-5, d-6.); see also, e.g., Cassidy v. Nicolo, No. 03-CV-6603-CJS, 2005 U.S. Dist. LEXIS 34160 (W.D.N.Y. Dec. 7, 2005); Johnson v. Quander, 370 F. Supp. 2d 79 (D.D.C. 2005).  Accordingly, Plaintiffs HIPAA claim must be dismissed.

### 4.      Claim for Loss of Society of Plaintiffs' Mother

Defendants Isenberg, CCCI, Howard Hames, Saint Francis move to dismiss Plaintiffs' claims for the "loss of society" of their mother (see Compl. ¶¶ 1, 3) for failure to state a claim upon which relief may be granted.  The Supreme Court has defined the term "loss of society" to include "the range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." Sea-Land Servs., Inc. v. Gaudet, 414 U.S. 573, 585 (1974).  A claim for "loss of society" is the

same as a claim for "loss of consortium." See Hern v. Safeco Ins. Co. of Illinois, 329 Mont. 347, 359, 125 P.3d 597, 606 (2005). The Second Circuit has not addressed whether a plaintiff may bring a loss of companionship claim under federal civil rights statutes. Federal courts have generally held, however, that plaintiffs alleging federal civil rights violations may not sue for the loss of companionship of a family member. See Pritzker v. City of Hudson, 26 F. Supp. 2d 433, 445 (N.D.N.Y. 1998) ("section 1983 does not support a derivative claim for loss of consortium") (citations omitted); see also, e.g., Russ v. Watts, 414 F.3d 783, 790 (7th Cir. 2005) (parents could not assert § 1983 claim for loss of society due to death of adult son); Claybrook v. Birchwell, 199 F.3d 350, 357 (6th Cir. 2000) ("no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members."); Shaw v. Stroud, 13 F.3d 791, 805 (4th Cir. 1994) (declining to recognize wife and minor child's Fourteenth Amendment claim for loss of love and support of their deceased husband and father); Valdivieso Ortiz v. Burgos, 807 F.2d 6, 9 (1st Cir. 1986); Trujillo v. Bd. of County Comm'rs, 768 F.2d 1186, 1190 (10th Cir. 1985). As the Sixth Circuit explained, a § 1983 claim is "entirely personal to the direct victim of the alleged constitutional tort," and therefore "no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." Claybrook, 199 F.3d at 357. Accordingly, Plaintiffs' claims for the loss of society, consortium, or companionship of their mother are not legally cognizable under federal law and are hereby dismissed. To the extent Plaintiffs "loss of society" claims allege a right under Connecticut state law, the Court declines to exercise pendent jurisdiction over such state law claims and, having dismissed the related federal claims,

dismisses the state claims as well. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

### 5.. *Medical Malpractice, Murder, and Wrongful Death Claims*

A reasonable reading of the lengthy and sometimes indecipherable Complaint lends an inference that Plaintiffs have alleged medical malpractice on the part of certain health care provider defendants. Defendants Interim, CCCI, and Saint Francis Hospital argue that, to the extent Plaintiffs bring claims for medical malpractice, they have not set forth a prima facie case to survive their motions to dismiss. In response, Plaintiffs deny that they have brought a claim of medical malpractice and assert that they have brought a claim for the murder of Ms. Musayelova. (See, e.g., Pls.' Opp. to Interim's Mot. to Dismiss at 3; Compl. ¶ 93.) Insofar as the Plaintiffs do allege murder or conspiracy to commit murder, no private cause of action exists for such conduct. The Fifth Amendment states: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. As this Court previously held in another case brought by Plaintiffs against different defendants regarding the same facts underlying this case, see Estate of Margo Musayelova v. Kataja, Civil No. 3:06cv881 (PCD), 2006 WL 3246779, at *1 (D. Conn. Nov. 7, 2006), private citizens do not have a private cause of action for criminal violations. The decision to investigate or prosecute a person for an alleged violation of a criminal statute is left to the discretion of the federal law enforcement agencies, and federal courts traditionally refrain from overturning, at the instance of a private person, discretionary decisions of federal prosecuting authorities not to prosecute persons against whom a complaint of criminal conduct has been made. See id at *6; see also Inmates of Attica Corr. Facility v. Rockefeller, 477 F.2d 375, 380 (2d Cir. 1973); Tosado v. Klein, Civ. Nos. B-90-082(WWE), B-90-502(WWE), 1991 WL 218547, at * 3 (D. Conn. Aug.

20, 1991).  Accordingly, to the extent Plaintiffs are bringing a claim for murder, that claim is hereby dismissed.

　　　　　To the extent that Plaintiffs do bring a claim of medical malpractice by certain defendants, they have failed to comply with the procedural requirements necessary to do so. Plaintiffs have not filed a certificate of good faith with an attached supportive report by a qualified health care provider, which is required to commence a medical malpractice action in Connecticut.  See Conn. Gen. Stat. § 52-190(a).  Section 52-190 explicitly provides that the "failure to obtain and file the written opinion required by subsection (a) of this section shall be grounds for the dismissal of the action."  Id. § 52-190(c).  See also Williams v. Nat'l R.R. Passenger Corp., 16 F. Supp. 2d 178, 181 (D. Conn. 1998); see also Anghel v. St. Francis Hosp. & Med. Ctr., No. Civ. 303CV00864 (AWT),  2005 WL 736837, at *5 (D. Conn. March 30, 3005) ("To bring a claim for medical malpractice, a plaintiff also must provide the certificate of good faith required by Connecticut General Statutes section 52-190a.").  Because Plaintiffs have failed to obtain and file a certificate of good faith, any claim of medical malpractice raised in the Complaint must be dismissed.

　　　　Plaintiffs also oppose the motion to dismiss any medical malpractice claim by arguing that Defendants failed to fully cooperate in providing informal discovery of Ms. Musayelova's medical records upon request.  Plaintiffs mistakenly read Section 52-190a as excusing a plaintiff's obligation to file a certificate if a health care provider fails to fully cooperate in providing informal discovery.  (See Pls.' Opp. to Def. Hebrew Home's Mot. to Dismiss at 28.) However, the statute provides that a court may issue sanctions against a plaintiff who has not proceeded in good faith where a health care provider has fully cooperated in providing informal

discovery, see § 52-190a, precisely the inverse of the framework upon which Plaintiffs rely.

More importantly, whether or not Defendants complied with Plaintiffs' informal request for

certain medical records is irrelevant at this point because Plaintiffs did not file the certificate

necessary to state a claim of medical malpractice, and so the Court declines to engage in any

further inquiry on this matter. Any claims for medical malpractice raised in the Complaint are

hereby dismissed.

Plaintiffs' "murder" claim may instead be construed as a civil claim for damages for the

wrongful death of Ms. Musayelova. Such a claim, however, must also be dismissed. No action

for wrongful death existed at common law or exists today in Connecticut except as otherwise

provided by the legislature. Ecker v. Town of West Hartford, 205 Conn. 219, 231 (1987). The

Connecticut wrongful death statute provides in relevant part: "In any action ... for injuries

resulting in death ... [the] executor or administrator may recover from the party legally at fault ...

provided no action shall be brought ... but within two years from the date of death." CONN. GEN.

STAT. § 52-555(a). Ms. Musayelova died on July 15, 2004. (Compl. ¶ 2.) Where, as here, a

federal court adjudicates state law claims, state statutes of limitations govern the timeliness of

state law claims, Stephens v. Norwalk Hosp., 162 F. Supp. 2d 36, 38 (D. Conn. 2001), and state

law determines what events serve to commence an action, Wilson v. Midway games, Inc., 198 F.

Supp. 2d 167, 174 (D. Conn. 2002), though federal law determines the proper method of service

process. Durrett v. Leading Edge Prods., Inc., 965 F. Supp. 280, 286 (D. Conn. 1997). Thus, a

wrongful death action is brought pursuant to § 52-555(a) when process is served on a defendant

pursuant to Fed. R. Civ. P. 4(d). In Connecticut, "an action is commenced not when the writ is

returned but when it is served upon the defendant." Rocco v. Garrison, 268 Conn. 541, 549

(2003); see also Converse v. Gen. Motors Corp., 893 F.3d 513, 516 (2d Cir. 1990) ("[T]he Connecticut Supreme Court has long adhered to the rule that only actual service upon the defendant will satisfy the state statute of limitations."). In this case, to bring a wrongful death action within the statute of limitations, Plaintiffs must have brought their wrongful death action on or before July 15, 2006. Although Plaintiffs filed their complaint on June 7, 2006, they did not serve Defendants until September, 2006, at the earliest, and December, 2006 at the latest. (See Doc. Nos. 12, 19, 52, 82, 83.) Defendants accordingly did not receive notice of this action until more than two years after Ms. Musayelova's death. Therefore, any state law wrongful death claims are barred by the statute of limitations set forth in § 52-555(a).

Defendants Interim, CCCI, Saint Francis Hospital, and Jewish Family Services also move to dismiss any malpractice or wrongful death claim on the ground that they are not liable for any torts committed by their agents or employees. Assuming that Plaintiffs' allegations that various Defendants' employees attempted to murder and ultimately murdered Ms. Musayelova were true, these defendants cannot be held vicariously liable for these alleged criminal acts. "In order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business." Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 500-01 (1995) (internal citations omitted). Whether an employee's intentional tort is within his or her scope of employment is usually a question of fact, but there are certain cases where the employee's "digression from duty is so clear-cut" that the issue becomes one of law. A-G Foods v. Pepperidge Farm, Inc., 216 Conn. 200, 207 (1990) (citations omitted). See also, e.g., Doe v. The Norwich Roman Catholic Diocesan Corp., 268 F. Supp. 2d 139, 142-43 (D. Conn. 2003) (alleged sexually abusive conduct

was an "abandonment of the church's business" and was outside the scope of the priest's employment); Nutt v. Norwich Catholic Diocese, 921 F. Supp. 66, 70-71 (D. Conn. 1995) (same).  The violation of one's civil rights, the intentional sabotage of a patient's care, the conspiracy to murder that patient, and the murder of that patient are clearly not perpetrated "in furtherance" of the business of these health care providers.  Rather, these alleged actions are a complete and utter abandonment of the business purpose of medical care and, if actually committed by any of their employees, were without question committed outside the scope of their employment.  Accordingly, even if Plaintiffs had stated a timely wrongful death claim, an appropriate medical malpractice claim, or any other tort claim against Interim, CCCI, Saint Francis Hospital, or Jewish Family Services, these defendants would not be liable for such claims and they would be dismissed.

### 6.       *Alien Tort Claims Act*

The final count of the Complaint asserts a claim against the United States, the State of Connecticut, and the "Jewish Zionists of Hartford" for violation of Plaintiffs' human rights.  In various briefs opposing the pending motions to dismiss, Plaintiffs contend that the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350, applies to their claims and that, under § 1350, the substantive law of Plaintiff Bagdasaryan's domicile governs her claims.  (See, e.g., Pls.' Opp. to Def. Hames's Mot. to Dismiss at 18.)  Section 1350 confers on federal courts jurisdiction over any civil action by an alien for a tort committed in violation of a treaty of the United States or the "law of nations," which, as used in this statute, refers to the body of law known as customary international law.  28 U.S.C. § 1350; Flores v. Southern Peru Copper Corp., 414 F.3d 233, 247 (2d Cir. 2003).  Customary international law is created by the general customs and practices of

nations and "is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." Id. at 248; see also Filartiga v. Pena-Irala, 630 F.2d 876, 888 (2d Cir. 1980); IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir. 1975) (Friendly, J.).

In this case, even though Plaintiffs allege that Defendants' violation of Plaintiffs' civil rights and their conspiracy to commit murder offended universal human values, the Complaint does not allege either a violation of a treaty or a violation of customary international law. "Even if certain conduct is universally proscribed by States in their domestic law, that fact is not necessarily significant or relevant for purposes of customary international law." Flores, 414 F.3d at 249; see also Filartiga, 630 F.2d at 888 (quoting Vencap, 519 F.2d at 1015). As the Second Circuit has explained, intra-national offenses such as official torture and genocide are wrongs of "mutual concern" that violate customary international law, but the "murder of one private party by another, universally proscribed by the domestic law of all countries (subject to varying definitions), is not actionable under the ATCA as a violation of customary international law because the 'nations of the world' have not demonstrated that this wrong is 'of mutual, and not merely several, concern.'" Flores, 414 F.3d at 249 (quoting Filartiga, 630 F.2d at 888). Accordingly, the Complaint does not allege a violation of the law of nations, and § 1350 therefore does not apply. To the extent Plaintiffs bring an ATCA claim, it is dismissed.

### 7.    *Qualified Immunity*

To the extent any claims remain against Defendants Chen, Hames, or the individual State Defendants, they are dismissed because these defendants are entitled to varying degrees of qualified immunity. First, any claims against Defendant Chen in his official capacity must be

dismissed because Government actors are "shield[ed] ... from suits for damages ... unless their actions violate clearly-established rights of which an objectively reasonable official would have known." Zieper v. Metzinger, No. 05-5250, 2007 WL 122016, at *5 (2d Cir. Jan. 19, 2007) (quoting Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). To determine whether an officer is entitled to qualified immunity, the Court must first ascertain "whether the facts alleged, taken most favorably to plaintiffs, demonstrate a violation of a constitutional right." Zieper, 2007 WL 122016, at *5 (citing Papineau v. Parmley, 465 F.3d 46, 55 (2d Cir. 2006)). A constitutional right is "clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." Phaneuf v. Cipriano, Civ. No. 3:03CV372 (AVC), 2007 WL 274535, at *3 (D. Conn. Jan. 25, 2007) (quoting Luna v. Pico, 356 F.3d 491, 490 (2d Cir. 2004) and Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003)). Plaintiffs have not established that Mr. Chen violated their clearly established constitutional rights by declining to investigate or prosecute Ms. Musayelova's death. Plaintiffs do not have a constitutional right to the federal prosecution of third parties. See, e.g., Cisneros v. Reno, No. 95 Civ. 9205 (RPP), 1996 WL 18874, at *2 (S.D.N.Y. Jan. 19, 1996) (holding that a private citizen "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." (quoting Linda R.S. v. Richard D., 410 U.S. 614 , 619 (1973))). The decision to investigate or prosecute an alleged crime is a matter of prosecutorial discretion. Id. Mr. Chen, therefore, did not violate any established constitutional rights in his response to Plaintiffs' requests, and so he cannot be liable for his official actions. Accordingly, all claims against Mr. Chen are hereby dismissed.

The claims against the individual State actors–Governor Rell, Attorney General

Blumenthal, Judge Killian, H. Wayne Carver, and Michael Starkowski–must also be dismissed because these defendants are entitled to varying degrees of immunity. In addition to being entitled to qualified immunity for the same reasons as is Mr. Chen, these State Defendants are also entitled to statutory immunity under Connecticut General Statute § 4-165, which provides in relevant part:

> No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter.

CONN. GEN. STAT. § 4-165(a). To allege sufficiently wanton, reckless or malicious conduct under § 4-165, Plaintiffs must show "the existence of a state of consciousness with reference to the consequences of one's acts... [that] is more than negligence, more than gross negligence." Martin v. Brady, 261 Conn. 372, 379 (2002). Nowhere in the Complaint do Plaintiffs allege that any of the individual State Defendants acted wantonly or recklessly. Although the Complaint contains general allegations that all defendants maliciously conspired to discriminate against Plaintiffs by murdering Ms. Musayelova and cover up her death, the Complaint does not sufficiently allege that any of the individual State Defendants acted with such malice that they may be personally liable for Plaintiffs' claims. Accordingly, Defendants Rell, Blumenthal, Killian, Carver, and Starkowski are entitled to statutory immunity from Plaintiffs' claims.

State Defendant Judge Killian is also entitled to absolute judicial immunity for any claim against him for monetary damages. "It is well established that 'a judge may not be civilly sued for judicial acts he undertakes in his capacity as a judge.'" Carrubba v. Moskowitz, 274 Conn. 533, 540 (2005) (quoting Lombard v. Edward J. Peters, Jr., P.C., 252 Conn. 623, 630 (2000)); see also Spring v. Constantino, 168 Conn. 563, 565 (1975). Nowhere does the Complaint allege

that Judge Killian acted outside his capacity as a judge or in clear absence of jurisdiction. See

Montero v. Travis, 171 F.3d 757, 761 n.2 (2d Cir. 1999) (finding no exception to the absolute

immunity rule where plaintiff did not allege that the defendant, a parole board official, did not

have jurisdiction over the plaintiff's parole status). Both Connecticut and federal law provide

absolutely immunity to allow judges to perform principled and fearless decision-making without

fear of retribution from disappointed parties. See Spring, 168 Conn. at 565. Consequently,

absolute judicial immunity bars all of Plaintiffs' claims for monetary damages against Defendant

Judge Killian.

Howard Hames also moves to dismiss the claims against him because he is protected by

quasi-judicial absolute immunity in his capacity as court-appointed conservator and attorney.

Collins v. West Hartford Police Dep't, 380 F. Supp. 2d 83, 91 (D. Conn. 2005). A court-

appointed conservator is protected by absolute quasi-judicial immunity for those activities that

are integrally related to the judicial process. Cok v. Cosentino, 876 F.2d 1, 3 (1st Cir. 1989).

"[A]llegations of malice, or bad faith or ... a claim of conspiracy will not defeat the protection of

derivative absolute immunity for actions taken pursuant to court orders." Dorman v. Higgins,

821 F.2d 133, 139 (2d Cir. 1987). None of the allegations in the Complaint demonstrates that any

of the actions taken by Defendant Hames were beyond the scope of the official function of a

court-appointed attorney or a court-appointed conservator. Furthermore, nowhere in the

Complaint do Plaintiffs allege that Defendant Hames was ever not acting pursuant to court orders

while serving as court-appointed attorney and conservator.

In opposition to Defendant Hames's motion, Plaintiffs cite to Connecticut General Statute

§ 45a-683, which provides immunity from civil liability to a plenary guardian, temporary limited

guardian, or limited guardian of a person with mental retardation, as grounds for abrogating immunity in this case. Because this statute shields guardians acting in good faith from civil liability, this statute neither applies to the present matter where the Complaint alleges that Defendant Hames was a conservator, not a guardian, compare Conn. Gen. Stat. §§ 45a-603 et seq. and §§ 45a-668 et seq. (providing for guardians) and §§ 45a-644 et seq. (providing for conservators), nor does it help Plaintiffs' argument. Even if § 45a-683 were applicable, Hames would be immune from liability because his alleged conduct did not breach any duty of care owed to Plaintiffs. Although the Complaint alleges that Hames refused to follow Ms. Rzayeva's orders (Compl. ¶¶ 268, 529), Hames was under no obligation to do so. Accordingly, Plaintiffs' claims against Defendant Hames must be dismissed because he is immune from suit.

### E.  Dismissal Pursuant to Rule 41(b)

Defendant Howard Hames also moves to dismiss all claims against him pursuant to Rule 41(b) due to Plaintiffs' failure to comply with an order of the court. Rule 41(b) provides for an action to be dismiss where a party fails to comply with a court order, and dismissal pursuant to Rule 41(b) operates as adjudication on the merits unless otherwise specified by the Court. FED. R. CIV. P. 41(b). In determining whether a case may be dismissed pursuant to 41(b), the Court should consider the following factors:

> (1) the duration of the plaintiff's failure to comply with the court order; (2) whether the plaintiff was on notice that failure to comply would result in dismissal; (3) whether the defendants are likely to be prejudiced by further delay in the proceedings; (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard; and (5) whether the judge has adequately considered a sanction less drastic than dismissal.

Spencer v. Doe, 139 F.3d 107, 112 (2d Cir. 1998). Dismissal is a harsh remedy and the Court should exercise caution when dismissing a pro se complaint. Id. However, "all litigants,

including pro ses, have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions." <u>McDonald v. Head Criminal Court Supervisor Officer</u>, 850 F.2d 121, 124 (2d Cir. 1988).

In this case, Hames maintains that Plaintiffs have repeatedly failed to comply with the Court's order requiring all documents to be served on all counsel in paper format. On January 18, 2007, the Court issued an order stating that this matter is not an e-filing case and that parties are required to certify service pursuant to Local Rule 5(b). (<u>See</u> Doc. No. 84.) On January 28, 2007, the plaintiff moved for clarification of the January 18, 2007 order again seeking permission to file documents by e-mail to the defendants. The Court denied the plaintiffs' Motion for Permission to File Court Documents by E-mail to Defendants on February 13, 2007. (<u>See</u> Doc. No. 176.) This issue was thereafter addressed by PJO David E. Schancupp at the status conference held on March 2, 2007, at which time the plaintiffs were again informed that they must provide copies of filings to defense counsel by U.S. mail. Despite the Court's rulings and PJO Schancupp's instructions at the status conference, Plaintiffs have continued to serve documents on Attorney Hames electronically. Such conduct violates the Court's orders and warrants dismissal of Plaintiffs' claims against Defendant Hames under Rule 41(b).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss [Doc. Nos. 38, 129, 144, 174, 190, 191, 195, 199, 253, 257, and 259] are hereby **granted.** Plaintiff Rzayeva's Motion to Appoint Counsel [Doc. No. 212] is **denied.** Plaintiffs' Motions to Strike [Doc. Nos. 66, 215] are **denied.** Plaintiffs' claims are dismissed in their entirety pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(5), 12(b)(6), and 41(b). Judgment is entered in favor of Defendants on all counts. The

clerk shall close the file.

SO ORDERED.

Dated at New Haven, Connecticut, this  31st  day of May, 2007.

_____/s/_____
Peter C. Dorsey, U.S. District Judge
United States District Court-